STATE OF NORTH CAROLINA v. CLIFTON EARL DICKENS

No. 80

(Filed 12 May 1971)

1. Criminal Law § 42— clothing worn by defendant in custody — admissibility

Clothing worn by a person while in custody under a valid arrest may be taken from him for examination and, when otherwise competent, may be introduced into evidence at his trial.

2. Arrest and Bail § 3— arrest without warrant

An arrest without a warrant except as authorized by statute is illegal.

**3. Arrest and Bail § 3; Criminal Law § 42— arrest without warrant — clothing taken from defendant**

Arrest of defendant for burglary without a warrant was valid under G.S. 15-41(2), and clothing taken from defendant after his arrest was properly admitted in evidence, where a person assaulted following a burglarious entry of her home gave officers a description of her assailant and his clothing, including the color and type of his shirt and trousers, officers knew the person they sought had struggled with the victim and had struck her with his hands, officers found defendant at his residence wearing clothing as described by the victim and with unexplained fresh scratches and marks on his hands and arms, and it had been raining that night and defendant's pants were wet from the waist down.

**4. Criminal Law § 68— hairs found at crime scene — lapse of five days from crime**

In this burglary prosecution, the trial court did not err in the admission of testimony by an officer that some five days after the crime was committed he found hairs inside and outside the burglarized dwelling which matched hairs found on defendant's clothing, the lapse of time which might have given someone else an opportunity to go on the premises and leave such hairs being a circumstance for the jury to consider in determining the credibility of the testimony.

**5. Criminal Law § 102 —argument of solicitor — statement that appeals go on forever — harmless error**

In this burglary prosecution, statements by the solicitor in his argument to the jury that "If a jury says guilty, the appeals can go on from now until Doom's Day," and that "Appeals can go on forever," while improper, *held* not prejudicial error where the trial court sustained defendant's objection to the remarks and the argument was not directed toward imposition of the death sentence.

**6. Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of jurors opposed to capital punishment — jury recommendation of life imprisonment**

Decision of *Witherspoon v. Illinois*, 391 U.S. 543, relating to the exclusion of veniremen who voice general objections to the death penalty, does not apply where the jury in a capital case recommends a sentence of life imprisonment.

**7. Jury § 7— jurors opposed to capital punishment — challenge for cause**

In this prosecution for the capital crime of burglary, the trial court properly allowed the State's challenges for cause of three prospective jurors who stated that they would not under any circumstances vote to return a verdict which would result in the imposition of the death penalty.

**8. Jury § 7— valid challenges for cause — solicitor's motives**

Where the solicitor challenged three prospective jurors for cause on a valid ground, and the court correctly excused the jurors, the

appellate court will not speculate as to the solicitor's motives in challenging the jurors.

APPEAL by defendant from *May, S.J.*, 26 October 1970 Special Session of MARTIN.

Defendant was tried upon a bill of indictment charging him with the capital crime of burglary.

The State's evidence tends to show: On the evening of 18 August 1970, Mrs. Geraldine Simpson was at her home in Williamston, North Carolina. Her husband was expected home from work at about 3:30 a.m. Mrs. Simpson went to bed shortly after 11:00 o'clock p.m., and she was awakened during the night when someone walked up on the back porch and rattled the screen. The person identified himself as her husband, but she knew it was not her husband's voice. Mrs. Simpson immediately ran to the front door, unlocked it, and called to a neighbor for help, and at that time her assailant came to the front porch. She slammed the front door, which did not shut because it was swollen as a result of damp weather, and retreated into the house to get a pistol. Before she could get the pistol, a man came into the house, caught her by the neck and covered her mouth with his hand. He dragged her to the front porch, where she managed to pull his hand off her mouth, and screamed. He then hit her several times, stated his intention to rape her, and, despite her continued resistance, dragged her into the yard by the hair of her head. A neighbor turned on a light on her front porch, and the man fled. After Mrs. Simpson returned to her house, she remembered someone saying it was ten minutes to one. Mrs. Simpson, without objection, testified:

"At the time I was attacked by the defendant, I noticed the odor of wine on his breath. . . . On the night in question, the defendant was wearing a yellow, gold, or beige, light shirt, and his arms were bare up above his elbows. After he hit me, I was bleeding from the nose and mouth and from the fingers where I cut them on the fence. There is no doubt in my mind whatsoever that the defendant sitting next to Mr. Gurganus is the boy that came into my house on August 19, 1970 in the nighttime. When he lunged at me in the front door, I threw my arms up. I recognized him from just below the eyes down. He was gritting his teeth and he was breathing hard, and I said

that would be one face or profile I would never forget the longest day I lived on this earth."

Police Chief John Swain testified that as the result of a call he arrived at the Simpson residence at about 12:30 a.m. and there talked with Mrs. Simpson. He thereafter talked with defendant at his home about 1:20 a.m. At this point the State offered to introduce into evidence clothing worn by the defendant at the time Officer Swain first saw him. Upon defendant's objection, the jury was excused and a *voir dire* hearing was held concerning the admissibility of the clothing. On *voir dire,* Officer Swain testified that he had known defendant about five years and that he went to defendant's residence as a result of Mrs. Simpson's description of her assailant. When he arrived at defendant's place of residence, he found defendant wearing clothes which also fitted Mrs. Simpson's description of the clothing worn by her assailant. Defendant was carried to the police station and informed of his constitutional rights and informed that he was a suspect in a burglary investigation. He surrendered his clothes to the police officers after they had furnished him other clothing. Defendant offered no evidence on the *voir dire.* The trial judge thereupon found facts consistent with the officer's testimony, and concluded:

"1. That Chief of Police John L. Swain arrested the defendant, Clifton Earl Dickens on the morning of August 19, 1970, after he had been informed that the felony of burglary had been committed at the home of Mrs. Geraldine Simpson, pursuant to the description which had been given to Chief Swain by Mrs. Geraldine Simpson.

"2. That the arrest made by Chief John L. Swain of the defendant was based upon probable cause and upon reasonable grounds upon which he could reasonably rely that the felony of burglary had been committed.

"3. That the defendant's Fourth Amendment rights and Sixth Amendment rights under the Constitution of the United States were not violated by Chief of Police John L. Swain, in placing the defendant under arrest and taking him into custody and placing him in jail and taking his clothing.

"4. That Chief of Police John L. Swain had made sufficient investigation to determine that a felony had been

committed, to wit, burglary, and that he had probable cause to believe that the defendant was the perpetrator of the crime.

"5. That no objection was made to the in court identification or the out of court identification of the defendant, and, therefore the Court has not made any findings of fact with respect to the incourt and out of court identification of the defendant, for the reason that this question has not been raised in the trial of this case.

"6. That the items of clothing which the State offers in evidence were legally obtained by Chief of Police John L. Swain, while the defendant was in custody, under lawful arrest, and, therefore, said State's Exhibits 3, 8 and 9 are admissible in evidence and the defendant's objection thereto is OVERRULED. Exception by the defendant."

The jury returned and defendant's clothing was admitted into evidence. Officer Swain then testified that defendant's trousers were wet from top to bottom when defendant gave him the clothes, and at that time they were matted with hair which consisted of brown and gray hair, one to two inches in length, and light brown or blond hair about four inches in length. In his opinion the short hairs were horse hairs. He described how the clothes were sealed in plastic bags and forward, together with separately packaged hairs cut from Mrs. Simpson's head, to the Federal Bureau of Investigation, Washington, D. C. Swain further testified that when he arrived at Mrs. Simpson's home on the morning of 19 August 1970, she was dressed in a blue nightgown, that her hair was disarranged, her lips were cut, and her face was "puffy." At that time Mrs. Simpson said that her assailant was a Negro male approximately 20 years old, about 5 feet 8 inches tall, weighing about 150 to 160 pounds, that he was not a black skinned person, and that he did not have a goatee. She also stated that her assailant was wearing a short-sleeved yellow or rusty gold colored shirt and black cotton trousers.

Myron Scholberg, an expert in identification of fibers for the Federal Bureau of Investigation, testified that he had examined the human hair samples sent to him for examination and comparison by the Williamston police and that the human hairs taken from defendant's clothes were "microscopically

identical" to the hairs taken from Mrs. Simpson's head. He stated on cross-examination that the science of comparison of human hairs was not so exact as to permit positive identification of hair as originating from a certain individual.

The State offered further testimony that when defendant was arrested he had fresh scratches on his face, hands and arms, that the knuckles of his right hand were skinned, and that he had been drinking.

At the close of the State's evidence defendant moved for a directed verdict and the motion was denied. We note in passing that in a criminal case the proper motion to test the sufficiency of the State's evidence to carry the case to the jury is a motion to dismiss the action or a motion for judgment as in case of nonsuit. G.S. 15-173.

Defendant took the stand in his own behalf. He testified, *inter alia,* that on the night of August 18, 1970 he was with another person drinking wine until about 11:30 p.m., and that he arrived at his home at 11:50 p.m. He testified that he did not again leave home until the officers carried him away. He accounted for the hairs on his trousers by stating he had ridden a pony that afternoon. He said that his britches had become wet when he walked through grass growing on the railroad track.

Defendant's aunt, Lucy May Dickens, in whose home defendant resided, corroborated his testimony as to the time at which he came home. She further testified that his pants were not soaked with water and that he had long whiskers growing on his chin. She did not notice any scratches on his face or arms.

Maletha Hudgins testified that on the night in question defendant called her home and asked to speak to her daughter at 11:55 p.m.

Roland Bland testified for defendant and stated that he was employed as a worker in the Martin County Jail. He saw defendant when he was brought into the jail and did not notice any cuts on his face.

Woodrow Keel, who took photographs of defendant on the night he was arrested, testified that the photographs did not show whether defendant's face was scratched, but they did reveal scratches on defendant's arm. On cross-examination he

stated that he remembered that defendant's face did, in fact, have scratches on it when he took the photographs.

Defendant presented other cumulative and corroborative testimony.

The State offered rebuttal testimony which tended to contradict some of defendant's witnesses.

At the close of all the evidence defendant again moved for a directed verdict, and the motion was again denied.

The jury returned a verdict of guilty of burglary in the first degree with recommendation that punishment be imprisonment for life in the State's prison. Defendant appealed.

*Attorney General Morgan and Deputy Attorney General Moody for the State.*

*Edgar J. Gurganus for defendant.*

BRANCH, Justice.

Defendant assigns as error the action of the trial judge in admitting into evidence, over objection, clothing worn by defendant when he was taken into custody a short time after the alleged crime.

[1] It is well settled in North Carolina that clothing worn by a person while in custody under a valid arrest may be taken from him for examination, and, when otherwise competent, such clothing may be introduced into evidence at his trial. *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345, *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568; *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269. Defendant stressfully argues that he was not in custody under a valid arrest.

[2] An arrest without a warrant except as authorized by statute is illegal. *State v. Moore,* 275 N.C. 141, 166 S.E. 2d 53; *State v. Mobley,* 240 N.C. 476, 83 S.E. 2d 100.

G.S. 15-41, in part, provides: "A peace officer may without a warrant arrest a person: . . . (2) When the officer has reasonable ground to believe that the person to be arrested has committed a felony and will evade arrest if not immediately taken into custody."

The courts have held that a description of an assailant's physical characteristics and his clothing may supply reasonable grounds for believing that he had committed a felony.

In *State v. Tippett, supra,* police officers were informed that a felony had been committed by a barefooted white man wearing coveralls. Police officers arrested the defendant without a warrant upon finding him dressed as described and hiding behind a bush two blocks from the scene of the crime. This Court held that under these circumstances it was lawful to arrest the defendant without a warrant.

In *State v. Grier,* 268 N.C. 296, 150 S.E. 2d 443, police officers knew that a robbery had been committed, and they had information that the robber wore checkered pants and had a cut on the rear of his right leg. When the police apprehended the defendant, dressed in checkered pants, with a cut on the rear of his right leg, they placed him under arrest. Incident to the arrest, the officers searched the defendant and found property on his person similar to that taken in the robbery. This Court held that the police officers had reasonable grounds to arrest the defendant, and that the arrest without a warrant was valid.

In the case of *State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741, police officers stopped an automobile which fitted the description of one used in connection with a robbery, and at that time observed a pistol lying on the seat of the car. The Court held that the officers had reasonable ground to believe that the defendant had committed a felony and would evade arrest if not taken into custody. Accord: *State v. Jacobs,* 277 N.C. 151, 176 S.E. 2d 744; *State v. Pearson* and *State v. Belk,* 269 N.C. 725, 153 S.E. 2d 494; *State v. Egerton,* 264 N.C. 328, 141 S.E. 2d 515; *People v. La Bostrie,* 14 Ill. 2d 617, 153 N.E. 2d 570; *People v. Kissane,* 347 Ill. 385, 179 N.E. 850; Holmgren, What Are Reasonable Grounds for Arrest, 42 Chi-Kent L. Rev. 101.

[3] Here, the victim of the assault gave police officers a description of her assailant, including information as to the color and type of his shirt and trousers. As a result of the description furnished, the officers went to defendant's residence and found him there, dressed as described, with unexplained fresh scratches on his hands and arms and skinned places on the knuckles on his right hand. The police were aware that the person whom they sought had struck his victim with his hands and that the person had been engaged in a struggle with his victim. It had

been raining on this night and defendant's pants were wet from the waist down.

There was sufficient competent evidence to support the trial judge's findings of fact, and the findings of fact in turn supported the trial judge's conclusion that the items of clothing were legally obtained while defendant was in custody under lawful arrest.

We have not here discussed defendant's argument as to certain misdemeanor warrants since we hold that the arrest was valid pursuant to G.S. 15-41(2).

The trial judge correctly admitted the items of clothing into evidence.

[4]  Defendant next assigns as error the admission of the testimony of Officer Swain to the effect that he had found hairs inside and outside the Simpson dwelling which matched the hairs found on defendant's clothing. He argues that five days had passed since the crime was committed, and although the house was locked, the premises had not been under constant surveillance since the date of the crime, and therefore someone else could have been on the premises and left the hairs.

Every circumstance that is calculated to throw light upon a supposed crime is admissible if otherwise competent. The weight of the evidence is for the jury. *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506; *State v. Ham,* 224 N.C. 128, 29 S.E. 2d 449; Strong's N. C. Index 2d, Criminal Law, § 33, p. 531.

The finding of the hairs similar to those found on defendant's clothing on the living room floor and in the moulding of the front porch of the victim's house is a circumstance tending to show that defendant had been on the premises. The lapse of time which might have given someone else opportunity to go on the premises and leave such hairs is a circumstance to be considered by the jury in determining the weight of the testimony.

[5]  Defendant contends that he should be granted a new trial because of a statement made by the solicitor for the State during his argument to the jury. The full argument of the solicitor does not appear in the record. The only excerpt from the argument is shown in the record as follows:

"If a jury says guilty, the appeals can go on from now until Doom's Day. Look at Cassius Clay. Appeals can go on forever. That is the reason we have these appeals. . . .

OBJECTION SUSTAINED EXCEPTION NO. 5."

The principles of law concerning arguments of counsel in contested cases have been recently stated in the case of *State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503, where Moore, J., speaking for the Court, stated:

"In this jurisdiction wide latitude is given to counsel in the argument of contested cases. Moreover, what constitutes an abuse of this privilege must ordinarily be left to the sound discretion of the trial judge. *State v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466; *State v. Christopher, supra* [258 N.C. 249, 128 S.E. 2d 667]. However, it is the duty of the judge to interfere when the remarks of counsel are not warranted, by the evidence and are calculated to mislead or prejudice the jury, the argument and conduct of counsel being largely in the control and discretion of the presiding judge. *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717. Ordinarily, exceptions to improper remarks of counsel during argument must be taken before verdict. *State v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35; *State v. Tyson,* 133 N.C. 692, 45 S.E. 838. Such exceptions, like those to the admission of incompetent evidence, must be made in apt time or else be lost. This general rule has been modified in recent years so that it does not apply to death cases where the argument of counsel is so prejudicial to defendant that in this Court's opinion it is doubted that the prejudicial effect of such argument could have been removed from the jurors' minds by any instruction the trial judge might have given. *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335; *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664."

Defendant cites and relies heavily upon the case of *State v. Little,* 228 N.C. 417, 45 S.E. 2d 542, where the solicitor stated that in the event of conviction there would be an appeal, and if the decision of the lower court were affirmed, there would be an appeal to the Governor and that not more than sixty percent of persons convicted of capital offenses were ever executed. The court granted a new trial, holding this argument to be prejudicial error.

State v. Dickens

*State v. Little, supra,* is distinguishable from instant case in that there there the death penalty was imposed. In Little the argument went further than in instant case by stating that not more than sixty percent of the persons convicted of capital crimes were ever executed. It is also clear that in the case before us for decision the argument was not directed toward imposing the death sentence.

In *State v. Tucker,* 190 N.C. 708, 130 S.E. 720, the defendant was charged with violating the prohibition laws. The solicitor stated that the defendants looked like professional bootleggers, and that their looks were enough to convict them. The trial judge held the argument to be proper and overruled defendant's objection, which was duly entered before verdict. This Court, granting a new trial, stated:

> ". . . To uphold this ruling would mean, not only to sanction the vituperative language used in the present case, but also to open the door for advocates generally to engage in vilification and abuse—a practice which may be all too frequent, but which the law rightfully holds in reproach."

In this case the language of the solicitor, when considered out of context, appears to have exceeded the bounds of the record evidence and of propriety. However, the record shows that the trial judge sustained defendant's objection, thereby avoiding the evil of approving or sanctioning the language of the solicitor. The record is mute as to whether the trial judge, after sustaining the objection, proceeded to instruct and caution the jury so as to correct the effect of the solicitor's argument. The record is equally silent as to whether the solicitor's statement was made in answer to argument of defendant's counsel. The argument obviously was not directed toward the imposition of the death sentence.

In *State v. Thompson,* 278 N.C. 277, 179 S.E. 2d 315, Higgins, Justice, quoted with approval from *State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424, the following:

> "The manner of conducting the argument of counsel, the language employed, the temper and tone allowed, must be left largely to the discretion of the presiding judge. He sees what is done, and hears what is said. He is cognizant of all the surrounding circumstances, and is a better judge

of the latitude that ought to be allowed to counsel in the argument of any particular case. It is only in extreme cases of the abuse of the privilege of counsel, and when this is not checked by the court, and the jury is not properly cautioned, this Court can intervene and grant a new trial."

Prejudicial error resulting from the solicitor's argument is not disclosed by this record.

Defendant assigns as error the action of the trial judge in excusing for cause three jurors because of their personal convictions concerning the death penalty.

[7] The jurors were excused after the State had exhausted its peremptory challenges and after each of the jurors, in effect, stated that he would not under any circumstances vote to return a verdict which would result in the imposition of the death penalty.

[6] The decision in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, does not govern the present case since the jury recommended a sentence of life imprisonment. *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481; *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788. Even had the decision in *Witherspoon v. Illinois* been applicable, the jurors would have been properly excused under its holding.

[7] The State is entitled to challenge for cause any prospective juror who states under oath that it would be impossible for him to return a verdict which would result in the imposition of the death sentence, even though the State proved the defendant guilty beyond a reasonable doubt. *State v. Peele, supra; State v. Bumper,* 270 N.C. 521, 155 S.E. 2d 173, reversed on other grounds in *Bumper v. North Carolina, supra.*

[8] Defendant advances the argument that there was error in allowing the challenge to each of the jurors because the solicitor wished to excuse the jurors for reasons other than their belief as to capital punishment. The solicitor challenged these jurors on a valid ground, and the trial judge ruled correctly. We cannot depart from the record and speculate as to the solicitor's motives in challenging these jurors.

This assignment of error is overruled.

Defendant assigned as error the trial judge's denial of his motions for directed verdicts. We do not deem it necessary

to discuss this assignment of error since the record reveals plenary evidence to repel defendant's motions.

No error.